## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **ROBERT WIRTZ, JR.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 18-CV-0599-GKF-FHM** |
| | ) | |
| **SHERIFF VIC REGALADO, in his** | ) | |
| **individual and official capacity; et al.,** | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |

## OPINION AND ORDER

Plaintiff Robert Wirtz, Jr., a state inmate appearing pro se, brings this action under 42 U.S.C. § 1983 and Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12131-12165. He claims defendants violated his rights, under federal and state law, while he was incarcerated as a pretrial detainee at the David L. Moss Criminal Justice Center (DLMCJC) in Tulsa, Oklahoma.

Before the Court are the motions to dismiss filed by the Tulsa Board of County Commissioners (BOCC) (Dkt. 21), Sheriff Vic Regalado (Dkt. 23), and Turn Key Health Clinics, LLC (Turn Key) (Dkt. 29), and the partial motion to dismiss filed by William Cooper, M.D. (Dkt. 30). For the reasons discussed below, the Court grants in part and denies in part all dismissal motions.

# I. Allegations in the Complaint[1]

Wirtz was incarcerated at the DLMCJC from October 29, 2016 to May 11, 2017. Dkt. 1, at 5 n.1; Dkt. 24, at 1 n.1.[2] When he was admitted to the jail, Wirtz told the intake nurse he had been diagnosed with spinal stenosis and had been prescribed "Fyntenol 100 microgram patches for pain." Dkt. 1, at 7. As of November 18, 2016, and consistent with DLMCJC's procedures, Wirtz had "a bottom bunk medical restriction" noted "within the jail computer system." *Id.* at 6-7, 14. In late November 2016, Wirtz met Sheriff Regalado in the medical unit and told Regalado he needed "effective pain management." *Id.* at 7. He also told Regalado about his bottom-bunk restriction. *Id.* Wirtz wrote letters to Regalado on December 6, 2016, February 1, 2017, and February 15, 2017, requesting that Regalado "intervene to see that [his] serious medical needs

---

[1] At the Court's direction, the Tulsa County Sheriff's Office and Turn Key submitted special reports (Dkts. 24, 31) pursuant to *Martinez v. Aaron*, 570 F.2d 317 (1978). With his responses to the dismissal motions, Wirtz also submitted a document styled as a "special report" (Dkt. 41). In that document, Wirtz alleges several facts drawn from the special reports and attached exhibits submitted by defendants. Dkt. 41. Because defendants seek dismissal under Fed. R. Civ. P. 12(b)(6), the Court must measure the sufficiency of the complaint by considering facts drawn from only certain materials—namely, the complaint, any documents the complaint incorporates by reference, and any documents referred to in the complaint to the extent those documents are central to Wirtz's claims and the parties do not dispute the authenticity of those documents. *Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010). The Court may consider facts from the special reports only to the extent those facts do not refute facts specifically pled by Wirtz in his complaint. *Swoboda v. Dubach*, 992 F.2d 286, 290 (10th Cir. 1993). To the extent the parties disagree on the facts, the Court must accept the well-pleaded factual allegations in Wirtz's complaint as true. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007). However, to the extent Wirtz attempts to supplement his complaint with additional factual allegations from his "special report," the Court will not consider those additional factual allegations. *See Smith v. Pizza Hut, Inc.*, 694 F. Supp. 2d 1227, 1230 (D. Colo. 2010) ("Plaintiffs cannot rectify their pleading deficiencies by asserting new facts in an opposition to a motion to dismiss."). After defendants filed their replies, Wirtz also filed two "notice[s] of Plaintiff's submission of additional authority" (Dkts. 55, 59). Those notices refer the Court to additional cases Wirtz cites to support his claims, but do not assert new factual allegations.

[2] For consistency, the Court's record citations refer to the CM/ECF header page number found in the upper right-hand corner of each document.

were met, including [the need for] effective pain management." Dkt. 1, at 7.

Unknown Classifications Officer # 1 (Officer # 1) ordered Wirtz moved to a top bunk on December 22, 2016, despite Wirtz's documented bottom-bunk restriction. Dkt. 1, at 7, 14. Officer # 1 "was obligated to know" about Wirtz's medical restriction because the DLMCJC has a procedure requiring the medical department to place medical restrictions on the jail's computer system. *Id.* at 14. Wirtz's "protests and requests to be moved to a bottom bunk for three days were ignored by all staff as a result of the systemic indifference promulgated and controlled by Regalado." *Id.* at 6. Wirtz fell from the top bunk on December 24, 2016, causing further injury to his spine and resulting in his "severe pain and suffering." *Id.* at 7. The fall and resulting injuries required a week-long stay at Hillcrest Hospital, where Wirtz was treated intravenously with pain medications. *Id.*

The hospital discharged Wirtz on December 29, 2016, with orders for "pain medications and follow up consultations with a pain management specialist and neurosurgeon." Dkt. 1, at 7. Upon his return to the DLMCJC, Wirtz "immediately asked [Dr.] Cooper to provide adequate pain management in accordance with the standard of care and orders from the Hillcrest doctors." *Id.* at 10. Dr. Cooper, the DLMCJC's medical director, "refused" to provide effective pain medications. *Id.* Wirtz submitted multiple requests for treatment and grievances to Cooper wherein he "explained [his] pain was so extreme that [he] was losing the feeling in his legs and groin and had lost control of his bladder on numerous occasions." *Id.* Cooper responded "by summoning [Wirtz] to his office and verbally ordering [him] to stop filing grievances." *Id.* Cooper also told Wirtz "repeatedly that he would not prescribe what other [d]octors had ordered no matter how bad the pain was." *Id.* Dr. Cooper's refusal to provide "pain medication caused [Wirtz] extreme suffering for over two months, to the point of partial paralysis and loss of bladder control on several

occasions." Dkt. 1, at 10.

On March 6, 2017, two months after Wirtz's release from the hospital, Dr. Cooper "finally" prescribed morphine to treat Wirtz's pain. Dkt. 1, at 7 n.2, 10. That same day, Cooper placed Wirtz in solitary confinement in the DLMCJC's medical unit. *Id.* at 11. Wirtz alleges Cooper placed him in solitary confinement "in direct response" to Wirtz's continuous filing of grievances and written complaints to the Medical Board, Sheriff Regalado and Turn Key. *Id.* at 10-11. Wirtz remained in solitary confinement from March 6, 2017, until May 11, 2017. *Id.* at 8, 11. During that period, Wirtz "was locked in a cell 24 hours a day," "was forced to eat on the floor, was limited to only 3 showers per week, [and] was denied access to Church and religious programs, law library, sunlight, recreation, television, and all other programs, activities and services allowed other inmates." *Id.* at 8, 11. In numerous grievances, Wirtz "requested a chair and table to eat on," but "Dr. Cooper flatly refused, stating that it was not a medical necessity." *Id.* at 11. "[A]lmost daily," Wirtz wrote "letters and grievances from solitary confinement pleading for the retaliation to stop" but Sheriff Regalado "allowed the retaliation and violations to continue for months." *Id.* at 8.

In late March 2017, Wirtz visited a neurosurgeon. Dkt. 1, at 11. The neurosurgeon ordered bi-weekly physical therapy and massage therapy, but Dr. Cooper did not provide either form of therapy. *Id.* Instead, Cooper "escalated the retaliation by moving [Wirtz] to a dry/camera cell from April 1 to April 13, 2017." *Id.* at 12. The cell "had no running water" and "bright lights were left on 24 hours a day." *Id.* at 8, 12. Wirtz was "forced to eat on the floor," "forced to beg staff for drinking water through the crack in the bottom of the cell door and [forced to beg] for the staff to flush his toilet, which they often refused." *Id.* at 12. In addition, Wirtz "was unable to wash properly after using the bathroom and before eating." *Id.* Cooper moved Wirtz back into a solitary cell with running water and a toilet after two attorneys visited Wirtz at the DLMCJC. *Id.*

Wirtz "repeatedly submitted written requests to [Dr.] Cooper and others throughout the period from December 30, 2016 through May 11, 2017, seeking a definitive plan of treatment for his serious medical need." Dkt. 1, at 12. In response, Cooper "became hostile and refused to provide a definitive written plan." *Id.*

On several occasions, Kathy Pingleton, the DLMCJC's medical records custodian, told Wirtz her office did not maintain his medical grievances. Dkt. 1, at 9. Pingleton told Wirtz that "nonmedical staff" maintained medical grievances pursuant to the DLMCJC's policies and procedures. *Id.* Wirtz complained to Dr. Cooper that his medical grievances "should be maintained within the context of the doctor-patient privilege" but Cooper "refused to maintain the privilege and continued to allow [Wirtz's] medical grievances and records to be maintained and disseminated by nonmedical jail staff." *Id.* at 13.

Based on these factual allegations Wirtz asserts (1) § 1983 claims, in Counts I, II and IV, against Sheriff Regalado, the BOCC, Dr. Cooper and Turn Key (collectively, movants) and Officer # 1 for violating his rights under the First, Fourth, Fifth, Eleventh and Fourteenth Amendments to the United States Constitution and the Health Insurance Portability and Accountability Act of 1996 (HIPAA), Pub. L. 104-191, 110 Stat. 1936 (Aug. 21, 1996) by (a) being deliberately indifferent to his serious medical needs (Count I), (b) retaliating against him for filing grievances (Count II), and (c) disclosing his private medical information to nonmedical jail personnel (Count IV);[3] (2) claims

---

[3] Wirtz alleges defendants violated his rights under the Eleventh Amendment with respect to the § 1983 claims he asserts, in Counts II and IV, for retaliation and violation of his constitutional privacy rights. Dkt. 1, at 5, 8-9, 13. But the right protected by the Eleventh Amendment belongs to States, not individuals. *See Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001) ("The ultimate guarantee of the Eleventh Amendment is that nonconsenting States may not be sued by private individuals in federal court."). Accordingly, to the extent Wirtz relies on alleged violations of the Eleventh Amendment to support the § 1983 claims he identifies in Counts II and IV, those claims are dismissed for failure to state a claim.

in Count III against all movants for violating Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12131-12165, by denying him access to programs, services and activities while he was in solitary confinement; (3) claims against all movants and Officer # 1 for violating his rights to due process and adequate medical care, under Article II, §§ 7 and 9 of the Oklahoma Constitution,[4] by (a) being deliberately indifferent to his serious medical needs (Count I), (b) retaliating against him for filing grievances (Count II), and (c) disclosing his private medical information to nonmedical jail personnel (Count IV); and (4) tort claims against Regalado, Dr. Cooper and Turn Key, under Oklahoma common law, for medical negligence, negligence per se and invasion of privacy based on (a) Dr. Cooper's refusal to provide a written treatment plan, (b) Regalado's and Cooper's breach of doctor-patient privilege through the disclosure of his private medical records to nonmedical jail personnel, and (c) Dr. Cooper's failure to provide

---

[4] Section 7 provides: "No person shall be deprived of life, liberty, or property, without due process of law." OKLA. CONST. art. II, § 7. Section 9 provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel or unusual punishments inflicted." OKLA. CONST. art. II, § 9.

adequate medical care.[5]  Dkt. 1, at 2-3, 6-14.  As compensation for these alleged violations, Wirtz

seeks "damages in excess of 1 million dollars."  *Id.* at 15.

## II.    Motion to Dismiss Standard

Movants seek dismissal of the complaint, in whole or in part, under Federal Rule of Civil

Procedure 12(b)(6).  To withstand a motion to dismiss, the complaint must allege "enough facts to

state a claim to relief that is plausible on its face."  *Bell Atl. Corp.*, 550 U.S. at 570.  A claim is

---

[5] Wirtz does not clearly tie his common-law tort claims to any specific counts identified in the complaint.  In addition, he does not describe any of those claims as asserting "negligence per se" or "invasion of privacy," but the Court finds it reasonable to construe the complaint as asserting both claims.  Throughout the complaint, Wirtz asserts that movants violated various provisions of Oklahoma statutory law and the Oklahoma Administrative Code relating to his medical treatment and the confidentiality of his medical records.  *See* OKLA. STAT. tit. 63, O.S. 2-551 (recognizing, in context of Oklahoma's Uniform Controlled Dangerous Substances Act, "that principles of quality medical practice dictate that the people of the State of Oklahoma have access to appropriate and effective pain relief"); OKLA. ADMIN. CODE § 435: 10-7-11 (recognizing same in context of regulating physicians' use of controlled substances for pain management); OKLA. STAT. tit. 59, § 509(19) (defining "unprofessional conduct" of a licensed physician to include the "[f]ailure to provide necessary ongoing medical treatment when a doctor-patient relationship has been established, which relationship can be severed by either party providing a reasonable period of time is granted"); OKLA. STAT. tit. 12, § 2503 (recognizing and defining physician-patient privilege in context of Oklahoma Evidence Code); OKLA. STAT. tit. 43A, § 1-109(A)(3) (limiting disclosure of confidential and privileged information relating to mental health or drug or alcohol abuse treatment); OKLA. STAT. tit. 43A, § 1-109(B) (limiting medical consumer's personal access to mental health or drug or alcohol or abuse treatment records); OKLA. ADMIN. CODE § 435: 10-7-11(2) (stating that physician prescribing controlled substances should develop written treatment plan); OKLA. ADMIN. CODE § 435: 10-7-4 (defining "unprofessional conduct" in context of State Board of Medical Licensure and Supervision's licensing and regulation of physicians).  The Court construes Wirtz's allegations that movants violated one or more of these statutes and regulations as an attempt to assert tort claims for negligence per se and invasion of privacy.  *See* Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 14 (Am. Law Inst. 2019) ("An actor is negligent if, without excuse, the actor violates a statute that is designed to protect against the type of accident the actor's conduct causes, and if the accident victim is within the class of persons the statute is designed to protect); *Howard v. Zimmer, Inc.*, 299 P.3d 463, 467 (Okla. 2013) ("The negligence per se doctrine is employed to substitute statutory standards for parallel common law, reasonable care duties. When courts adopt statutory standards for causes of action for negligence, the statute's violation constitutes negligence per se."); *Eddy v. Brown*, 715 P.2d 74, 77-78 (Okla. 1986) (identifying elements required to prove invasion of privacy by publication of private facts as (1) publicity, (2) which is unreasonable and (3) which is given as a private fact).

plausible if the facts alleged "raise a reasonable expectation that discovery will reveal evidence" of the conduct necessary to establish plaintiff's claim. *Id.* at 556; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."). The complaint need not contain "detailed factual allegations," but it must contain "more than labels and conclusions" or "formulaic recitation[s] of the elements of a cause of action." *Bell Atl. Corp.*, 550 U.S. at 555.

When considering the sufficiency of the complaint, a court must accept as true all the well-pleaded factual allegations and construe them in the plaintiff's favor. *Id.* However, the court need not accept as true either legal conclusions or conclusory statements devoid of factual support. *Id.*; *Iqbal*, 556 U.S. at 678. In addition, when a plaintiff appears pro se the court must liberally construe the complaint. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). Like all plaintiffs, a pro se plaintiff bears the burden to "alleg[e] sufficient facts on which a recognized legal claim could be based." *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). But the rule of liberal construction eases that burden by permitting the court to overlook basic drafting errors and confusion of legal theories in determining whether the complaint can be "reasonably read . . . to state a valid claim on which the plaintiff could prevail." *Id.* At the motion-to-dismiss stage, a "well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of [the alleged] facts is improbable." *Straub v. BNSF Ry. Co.*, 909 F.3d 1280, 1287 (10th Cir. 2018) (quoting *Bell Atl. Corp.*, 550 U.S. at 556). But dismissal is appropriate "when the allegations in [the] complaint, however true, could not raise a claim of entitlement to relief." *Bell Atl. Corp.*, 550 U.S. at 558.

## III. Discussion

Wirtz invokes this Court's jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3), as to the claims he asserts under § 1983 and the ADA, and asks the Court to exercise supplemental

jurisdiction, under 28 U.S.C. § 1367(a), over his related state law claims.[6] *Id.* at 1-2. Ordinarily, a federal court should decline to exercise supplemental jurisdiction over state law claims if all federal claims asserted in the same action "disappear early in the litigation." *Birdwell v. Glanz*, 790 F. App'x 962, 964 (10th Cir. 2020) (unpublished).[7] Accordingly, the Court first addresses movants' arguments for dismissal of Wirtz's federal claims, then addresses their arguments for dismissal of his related state law claims.

## A.    § 1983 claims

Under § 1983, Wirtz claims all four movants violated his rights under the Fourteenth Amendment by being deliberately indifferent to his serious medical needs (Count I), violated his rights under the First, Fifth and Fourteenth Amendments by retaliating against him for filing grievances (Count II), and violated his rights under the First, Fourth, Fifth and Fourteenth Amendments by disseminating his private medical information to nonmedical jail personnel (Count IV). Dkt. 1, at 6-14. He purports to sue each movant in his, or its, individual and official capacities. *Id.* at 5.

To state a plausible claim for relief under § 1983, a plaintiff must allege facts demonstrating that (1) a "person" (2) acting under color of state law, (3) deprived the plaintiff of, or caused another to deprive the plaintiff of, (4) a right protected by the United States Constitution or other federal law. *Dodds v. Richardson*, 614 F.3d 1185, 1199-1200 (10th Cir. 2010); *Summum v. City of Ogden*, 297 F.3d 995, 1000 (10th Cir. 2002).

---

[6] In exercising supplemental jurisdiction over state law claims in a federal question case, the federal court applies the substantive law of the forum state. *BancOklahoma Mortg. Corp. v. Capital Title Co.*, 194 F.3d 1089, 1103 (10th Cir. 1999).

[7] The Court cites this unpublished decision, and other unpublished decisions herein, as persuasive authority. *See* Fed. R. App. P. 32.1(a); 10th Cir. R. 32.1(A).

When a plaintiff sues a defendant in his or her individual capacity, the defendant "may be subject to personal liability and/or supervisory liability." *Brown v. Montoya*, 662 F.3d 1152, 1163 (10th Cir. 2011). Personal liability requires facts showing the defendant's "personal involvement in the alleged constitutional violation. *Id.* To "impose liability upon a defendant-supervisor," who did not personally participate in the alleged violation, a plaintiff must allege facts "show[ing] that '(1) the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation.'" *Id.* at 1164 (quoting *Dodds*, 614 F.3d at 1199).

When a plaintiff sues an individual in his or her official capacity, the suit is "essentially another way of pleading an action against the county or municipality [the official] represent[s]." *Porro v. Barnes*, 624 F.3d 1322, 1328 (10th Cir. 2010). But a county "may not be held liable under § 1983 solely because it employs a tortfeasor." *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 403 (1997). Rather, a county may be liable only under a theory of municipal liability. *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 694 (1978). To state a plausible municipal-liability, or *Monell*, claim, a plaintiff must allege facts demonstrating "(1) the existence of a municipal policy or custom by which the plaintiff was denied a constitutional right and (2) that the policy or custom was the moving force behind the constitutional deprivation." *Sanders v. Glanz*, 138 F. Supp. 3d 1248, 1254 (N.D. Okla. 2015). Under Tenth Circuit precedent, these same principles apply when the defendant is a private entity or corporation acting under color of state law. *Wishneski v. Andrade*, 572 F. App'x 563, 567 (10th Cir. 2014) (unpublished); *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1216 (10th Cir. 2003). Thus, "to hold a corporation liable under § 1983 for employee misconduct, a plaintiff must demonstrate the existence of the same sort of custom or

policy that permits imposition of liability against municipalities under *Monell*." *Wishneski*, 572 F. App'x at 567.

### 1.    Claims against the BOCC

Wirtz claims the BOCC is liable for each of the constitutional violations alleged in Counts I, II and IV, and he purports to sue the BOCC "in their individual and official capacities." Dkt. 1, at 1, 5, 9-10. In support, he alleges the BOCC is responsible for funding and maintaining the DLMCJC and is generally aware that "policies, practices and procedures" at the DLMCJC "include deliberate indifference to inmates' serious medical needs, retaliation for seeking redress for grievances, and other atrocities." *Id.* at 9. He further alleges the BOCC has not taken any "affirmative or effective measures to remedy" the DLMCJC's deficiencies. *Id.* More specifically, Wirtz alleges he "personally notified the Board of his medical condition and requested [its] intervention on January 30, 2017, February 1, 2017 (When he notified them of his tort claim for the fall) and March 13, 2017." *Id.* Wirtz alleges he "received absolutely no response or assistance" from the BOCC. *Id.*

The BOCC moves to dismiss all § 1983 claims asserted against it for two reasons. First, it argues Wirtz fails to state any plausible individual-capacity claims because his allegations relevant to the BOCC do not suggest any actions or omissions on the part of individual board members. Dkt. 21, at 2-4. Second, the BOCC argues it should be dropped as an "improper" defendant, under Fed. R. Civ. P. 21, as to any official-capacity claims because those claims duplicate the official-capacity claims Wirtz asserts against Sheriff Regalado. Dkt. 21, at 4-8; Dkt. 48, at 3-4.

### a.    Individual-capacity claims

Accepting Wirtz's allegations as true, the Court finds them insufficient to state any plausible individual-capacity claims against individual members of the BOCC. Wirtz's most

specific allegation with respect to the BOCC is that he "personally notified the Board of his medical condition and requested their intervention" on three separate occasions. Dkt. 1, at 9. This allegation does not suggest any involvement on the part of individual board members. Thus, to the extent Wirtz purports to assert individual-capacity claims against any members of the BOCC, he fails to state a claim.

### b. Official-capacity claims

Contrary to the BOCC's position, the BOCC is not an "improper" defendant as to the official-capacity claims. The BOCC and Sheriff Regalado are both proper defendants to the extent Wirtz intends to hold Tulsa County liable for the alleged constitutional violations. *Brashear v. Tulsa Cty. Bd. of Cty. Comm'rs*, No. 15-CV-0473-GKF-PJC, 2015 WL 8485250, at *2 & n.1 (N.D. Okla. Dec. 9, 2015) (unpublished). But, as the BOCC contends and Wirtz concedes, the official-capacity claims he asserts against the BOCC are redundant with the official-capacity claims he asserts against Sheriff Regalado. Dkt. 21, at 8; Dkt. 45, at 2; Dkt. 48, at 1. The Court agrees that Sheriff Regalado is the more appropriate defendant as to those claims because he is the Tulsa County official responsible for promulgating and enforcing policies for the DLMCJC, providing medical care to inmates and detainees, and operating the jail on a daily basis. *See* OKLA. STAT. tit. 19, § 513; *Estate of Crowell ex rel. Boen v. Bd. of Cty. Comm'rs of Cleveland Cty.*, 237 P.3d 134, 142 (Okla. 2010) ("Under Oklahoma law, the sheriff is the final policymaker for a county jail. The sheriff, and not the [BOCC], is responsible for medical care in Oklahoma."). Each of Wirtz's § 1983 claims arise from alleged deficiencies in the daily operation of the DLMCJC—specifically, deficiencies in providing medical care to inmates, assigning inmates to certain cells and bunks, and maintaining inmates' private medical records. These are specific areas within Sheriff Regalado's control as "the Tulsa County official charged with managing the jail." *Burke v.*

*Regalado*, 935 F.3d 960, 1001 (10th Cir. 2019). Accordingly, the Court agrees with the BOCC and Wirtz that the official-capacity claims asserted against the BOCC should be dismissed as redundant.

Based on the foregoing, the Court grants the BOCC's dismissal motion as to all § 1983 claims asserted against it in Counts I, II and IV.[8]

### 2. Claims against Dr. Cooper

Wirtz identifies Dr. Cooper as the DLMCJC's medical director and the person "directly responsible" for his medical care. Dkt. 1, at 10. In Count I, Wirtz claims Dr. Cooper acted with deliberate indifference to his serious medical needs, in violation of the Fourteenth Amendment, (1) by depriving him of effective pain medications from December 29, 2016, until March 6, 2017, and (2) by denying him physical and massage therapy that was prescribed by a neurosurgeon in late March 2017. Dkt. 1, at 10-11. In Count II, he claims Dr. Cooper retaliated against him for filing grievances, in violation of the First, Fifth and Fourteenth Amendments, (1) by placing Wirtz in solitary confinement in the medical unit from March 6, 2017, until May 11, 2017, and (2) by placing him in a dry/camera cell from April 1 until April 13, 2017. *Id.* at 11-12. In Count IV, he claims Dr. Cooper violated the HIPAA and his privacy rights, under the Fourth, Fifth and Fourteenth Amendments, by disseminating his private medical information to nonmedical jail personnel. Dkt. 1, at 12-13.

---

[8] It is not clear from the complaint whether Wirtz also asserts the HIPAA claim against the BOCC. Dkt. 1, at 9-10. To the extent he does, that claim too is redundant with his HIPAA claim against Sheriff Regalado. In any event, the HIPAA claim fails because Wirtz correctly concedes that he has no private cause of action under the HIPAA. Dkt. 44, at 12; *see Wilkerson v. Shinseki*, 606 F.3d 1256, 1267 n.4 (10th Cir. 2010) (noting plaintiff attempted to allege HIPAA violation and stating, "[a]ny HIPAA claim fails as HIPAA does not create a private right of action for alleged disclosures of confidential medical information").

Dr. Cooper does not seek dismissal of the deliberate-indifference and retaliation claims asserted against him in Counts I and II. Dkt. 30, at 6. He moves to dismiss only the HIPAA and constitutional privacy claims asserted against him in Count IV. *Id.* at 6; Dkt. 52, at 4-5. With respect to those claims, Wirtz alleges he "repeatedly" complained to Dr. Cooper "that his private medical grievances" should not be maintained or accessed by "nonmedical staff." Dkt. 1, at 13. He further alleges that, despite his complaints, Dr. Cooper "refused to maintain" doctor-patient privilege and "continued to allow [Wirtz's] medical grievances and records to be maintained and disseminated by nonmedical jail staff." *Id.*

### a. HIPAA claim

Dr. Cooper contends, and Wirtz concedes, that the HIPAA claim should be dismissed because there is no private cause of action under the HIPAA. Dkt. 30, at 12-13; Dkt. 42, at 3; *Wilkerson*, 606 F.3d at 1267 n.4. The Court therefore grants Dr. Cooper's dismissal motion as to the HIPAA claim asserted against him in Count IV.

### b. Constitutional privacy claims

Wirtz argues he should nevertheless be allowed to proceed against Dr. Cooper on the claims in Count IV that allege violations of his constitutional rights to privacy. Dkt. 42, at 3. Dr. Cooper contends the facts alleged are not sufficient to state any plausible constitutional violations. Dkt. 52, at 4-5.

Under Tenth Circuit precedent, "[t]here is no dispute that confidential medical information is entitled to constitutional privacy protection." *Herring v. Keenan*, 218 F.3d 1171, 1175 (10th Cir. 2000) (quoting *A.L.A. v. West Valley City*, 26 F.3d 989, 990 (10th Cir. 1994)); *see also Eastwood v. Dep't of Corr. of State of Okla.*, 846 F.2d 627, 630–31 (10th Cir. 1988) ("This penumbra [of a variety of provisions in the Bill of Rights] protects two kinds of privacy interests:

the individual's interest in avoiding disclosure of personal matters and the interest in being independent when making certain kinds of personal decisions."). But "a prisoner's right to privacy in his medical information is less than absolute." *Leiser v. Moore*, Case No. 16-4110-DDC-KGS, 2017 WL 4099469, at * 4 (D. Kan. Sept. 15, 2017) (unpublished); *see also C.M. v. Urbina*, 640 F. App'x 825, 832 (10th Cir. 2016) (unpublished) (noting that plaintiff serving probation was "subject to some limitations on his constitutional rights"). And a prison's policies may infringe on a prisoner's constitutional right to privacy if they are "reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987).

For two reasons, the Court finds Wirtz's allegations, even accepted as true, fail to state plausible constitutional claims. First, as Dr. Cooper contends, Wirtz fails to identify the nature of the medical information Dr. Cooper allegedly disclosed. Rather, he generally asserts Dr. Cooper failed to maintain the privacy of his medical grievances and allowed nonmedical jail personnel to access his medical records. Dkt. 1, at 12-13. Under some circumstances, the disclosure of a prisoner's medical information may violate a prisoner's right to privacy. *Compare Herring*, 218 F. 3d at 1175 (concluding that prisoner "alleged a violation of a constitutional right to privacy in the non-disclosure of information regarding one's HIV-positive status by a government official"), *with C.M.*, 640 F. App'x at 832-33 (distinguishing *Herring* and concluding public health officials did not violate probationer's privacy rights by disclosing his HIV status to his counselor and probation officers). Here, on the facts alleged, it is reasonable to infer that the complained-of disclosures pertain to the treatment of, or the alleged failure to treat, Wirtz's spinal stenosis. Dkt. 1, generally. While Wirtz's allegations show that he experiences sometimes severe pain as a result of his spinal stenosis, that condition hardly carries the same stigma as an HIV-positive diagnosis. Second, as Dr. Cooper contends, the facts alleged suggest the disclosure of Wirtz's medical

information was limited in scope and related to a legitimate penological purpose—namely, his information was disclosed to jail personnel charged with maintaining medical grievances filed by DLMCJC inmates. Under these facts, the Court finds it implausible that the disclosure of his medical records violates the Constitution.

For these reasons, the Court agrees with Dr. Cooper that Wirtz's allegations do not plausibly support that Dr. Cooper wrongfully disseminated Wirtz's private medical information, let alone that he did so in a manner that violated Wirtz's constitutional rights to privacy. The Court therefore grants Dr. Cooper's dismissal motion as to the constitutional privacy claims asserted against him in Count IV.

### 3. Claims against Turn Key

Wirtz identifies Turn Key as the health care provider that employs Dr. Cooper and contracts with Sheriff Regalado to provide medical care for DLMCJC prisoners. Dkt. 1, at 13. Wirtz alleges Turn Key is liable for Dr. Cooper's deliberate indifference "in all aspects" and for Cooper's acts of retaliation, as alleged in Counts I and II. *Id.* at 13-14. In support, he alleges Turn Key "is directly responsible for the policies, practices and procedures within the medical department and for the actions of their employee [Dr.] Cooper." *Id.* at 13. Wirtz further alleges Turn Key "employs several of the nurses and medical staff" that were employed by the DLMCJC's former medical provider and that those employees "have been repeatedly found to be deliberately indifferent" to prisoners' medical needs. *Id.* Finally, Wirtz alleges Turn Key "had personal knowledge" of Dr. Cooper's failure to provide adequate medical care and his acts of retaliation because Wirtz sent "numerous complaints and correspondences" to Turn Key's Oklahoma City

office in February and March 2017.[9]  Dkt. 1, at 13.

### a. Deliberate-indifference and retaliation claims

Turn Key seeks dismissal of the deliberate-indifference and retaliation claims, for two reasons.  First, Turn Key contends it cannot be held liable for Dr. Cooper's allegedly unconstitutional conduct solely on a theory of *respondeat superior*.  Dkt. 29, at 11-13.  The Court agrees.  To the extent Wirtz suggests Turn Key may be liable for Dr. Cooper's conduct simply because Turn Key employs Dr. Cooper, he fails to state a plausible claim.  *See Carr v. El Paso Cty.*, 757 F. App'x 651, 655 (10th Cir. 2018) (unpublished) (concluding that private companies employed to perform services ordinarily provided by government entities cannot be held liable under § 1983 for the "unconstitutional conduct of their subordinates under a theory of *respondeat superior*" (quoting *Iqbal*, 556 U.S. at 676)).

Second, Turn Key contends it cannot be held liable under a theory of municipal liability because Wirtz's allegations "(1) do not identify a policy or custom; (2) are conclusory; and (3) are not *directly linked* to [Wirtz's] experience in the [DLMCJC] or the claims he asserts *in this case*." Dkt. 29, at 13-15.  The Court disagrees.  A plaintiff can state a plausible *Monell* claim against a private corporation by alleging facts demonstrating "actions [were] taken by subordinate employees in conformance with preexisting official policies or customs."  *Seifert v. Unified Gov't of Wyandotte Cty./Kansas City*, 779 F.3d 1141, 1159 (10th Cir. 2015).  Accepting Wirtz's allegations as true, Turn Key "is directly responsible for the policies, practices and procedures

---

[9] Wirtz purports to sue Turn Key "individually and officially."  Dkt. 1, at 1, 5.  But he identifies Turn Key as a private limited liability corporation, and his allegations suggest he intends to hold Turn Key liable, either as Dr. Cooper's employer or as the entity that provides medical care to DLMCJC inmates through its contract with the Tulsa County Sheriff's Office.  Dkt. 1, at 13-14.  Consequently, the Court considers only whether Wirtz states any plausible *Monell* claims against Turn Key.  *See Dubbs*, 336 F.3d at 1216.

within the medical department," that numerous audits of the DLMCJC's medical department have revealed "broad and long-standing systemic deficiencies" with respect to providing medical care to inmates, and Turn Key continues to employ nurses and other medical personnel that were employed by the previous medical provider who have been deliberately indifferent to the serious medical needs of inmates in the past.[10] Dkt. 1, at 6, 13. He also alleges Turn Key operates with a "prevailing attitude of indifference to inmates' medical needs." *Id.* at 13 n.4. Wirtz's allegations at least raise a reasonable inference that Turn Key maintains a custom—*i.e.*, a "continuing, persistent and widespread practice"—of permitting Turn Key employees to disregard the serious medical needs of DLMCJC inmates. *See Gates v. Unified Sch. Dist. No. 449*, 996 F.2d 1035, 1041 (10th Cir. 1993) (describing custom as "continuing, persistent and widespread practice of unconstitutional conduct" by municipal employees). And it is at least plausible that Dr. Cooper's actions of depriving Wirtz of prescribed medication and treatments and retaliating against him for filing medical grievances and complaints were taken "in conformance with" that custom. *Seifert*, 779 F.3d at 1159.

The Court therefore denies Turn Key's dismissal motion as to the deliberate-indifference and retaliation claims asserted against it in Counts I and II.

### b.    HIPAA and constitutional privacy claims

The Court agrees with Turn Key that it is not clear from the complaint whether Wirtz also

---

[10] Because Wirtz alleges that Turn Key continues to employ nurses and other medical personnel that were employed by the previous medical provider, the Court may reasonably infer that Turn Key continued the policies or customs of prior medical providers at DLMCJC. Moreover, Wirtz does not tie the allegations of "broad and long-standing systemic deficiencies" to any specific healthcare provider. Finally, Wirtz appears pro se and therefore the Court must liberally construe the complaint. *Erickson*, 551 U.S. at 94. For these reasons, Wirtz's allegations are distinguishable from those recently considered by the Court in [Doc. 39], *Lee v. Turn Key Health Clinics, LLC,* No. 19-CV-00318-GKF-JFJ (Feb. 27, 2020).

seeks to impose liability against Turn Key for the HIPAA and constitutional privacy claims asserted in Count IV. Dkt. 29, at 17. However, Wirtz concedes he has no private cause of action under the HIPAA, *see* Dkt. 46, at 8, and, for the reasons previously discussed, he fails to state any plausible claims that Dr. Cooper violated his constitutional rights to privacy by disclosing his medical information to nonmedical jail personnel, *see supra* section III.A.2.b. Thus, he cannot proceed against Turn Key, under a theory of municipal liability, as to the constitutional claims asserted in Count IV. *See Dodds*, 614 F.3d at 1202 (noting that *Monell* claim requires allegations that "the enforcement of [the municipalities'] policies or customs by their employees cause[d] a deprivation of a person's federally protected rights"). Accordingly, the Court grants Turn Key's dismissal motion as to all claims alleged in Count IV.

### 4. Claims against Sheriff Regalado

Wirtz claims Sheriff Regalado, the Tulsa County Sheriff, is liable for each of the constitutional violations alleged in Counts I, II and IV. He purports to sue Regalado in his individual and official capacities. Dkt. 1, at 1, 5. In Count I, he claims Regalado acted with deliberate indifference to his serious medical needs, in violation of the Fourteenth Amendment, (1) by permitting Officer # 1 to assign Wirtz to a top bunk despite his documented bottom-bunk restriction[11] and (2) by allowing Dr. Cooper to deprive him of effective pain management from December 29, 2016, until March 6, 2017. Dkt. 1, at 6-8. In Count II, Wirtz claims Regalado

---

[11] Wirtz also asserts his Count I deliberate-indifference claim against Officer # 1, presumably in his individual capacity, as to the top-bunk placement. Dkt. 1, at 14. In a prior order (Dkt. 102), filed January 22, 2020, the Court notified Wirtz that Officer # 1 had not been served and directed Wirtz to show cause why Officer # 1 should not be dismissed from this action. In response to the show cause order, Wirtz agreed to dismiss his claims against Officer # 1. Dkt. 103. The Court therefore dismisses Officer # 1 from this action, without prejudice, based on Wirtz's failure to timely effect service. *See* Fed. R. Civ. P. 4(m).

violated his rights, under the First, Fifth and Fourteenth Amendments, by allowing Dr. Cooper to place him in solitary confinement and in a dry/camera cell as retaliation for filing grievances. *Id.* at 8. In Count IV, Wirtz claims Regalado violated the HIPAA and his constitutional rights to privacy, under the First, Fourth, Fifth and Fourteenth Amendments, by maintaining a policy that allows nonmedical jail staff to access his private medical records. *Id.* at 9.

Sheriff Regalado moves to dismiss all § 1983 claims asserted against him. He argues Wirtz fails to state any plausible claims against him, in either his individual or official capacity, because Wirtz fails to allege or identify any policy or custom created or enforced by Regalado that caused the alleged constitutional violations. Dkt. 23, at 7-17; Dkt. 50, at 2-4. Alternatively, Regalado asserts that he has qualified immunity for any individual-capacity claims Wirtz asserts against him because Wirtz does not plausibly allege that Regalado violated his constitutional rights. Dkt. 23, at 17-18.

### a. Deliberate indifference: Top-bunk placement

Wirtz claims Regalado, in his "supervisory capacity," acted with deliberate indifference to his serious medical needs by permitting Officer # 1 to order his top-bunk placement. Dkt. 1, at 6-7. In support of this claim, Wirtz alleges that, on December 22, 2016, Officer # 1 "forced" him to use a top bunk despite the fact that Wirtz had been given a "bottom bunk restriction" on November 18, 2016. Dkt. 1, at 7, 14. Wirtz alleges his "protests and requests to be moved to a bottom bunk for three days were ignored by all staff as a result of the systemic indifference promulgated and controlled by Regalado." *Id.* at 6. On December 24, 2016, Wirtz fell from the top bunk, resulting in "severe pain and suffering" that required a week-long hospital stay. *Id.* at 7, 14.

Wirtz claims Officer # 1 acted with deliberate indifference by ordering the top-bunk placement he knew, or should have known, that Wirtz had a bottom-bunk restriction given that the

DLMCJC's policy requires the medical department to indicate medical restrictions in the jail's computer system. Dkt. 1, at 14. Wirtz claims Sheriff Regalado is responsible for Officer # 1's actions because (1) Wirtz personally informed Regalado of his medical needs in November 2016, including his need for a bottom bunk, (2) Officer # 1 is Regalado's "subordinate" and (3) Regalado "is responsible for continuing and maintaining the policies, practices and customs wherein his subordinates were allowed and even encouraged to violate Plaintiff's constitutional rights . . . by being deliberately indifferent to Plaintiff's serious medical needs." Dkt. 1, at 6-7.

### i. *Supervisory liability*

To the extent Wirtz seeks to hold Sheriff Regalado liable, in his individual capacity, under a theory of supervisory liability, the Court agrees that Wirtz fails to state a plausible Fourteenth Amendment claim as to the top-bunk placement. Under the Fourteenth Amendment, jail officials must provide adequate medical care for pretrial detainees. *Rife v. Okla. Dep't of Pub. Safety*, 854 F.3d 637, 647 (10th Cir. 2017). A constitutional violation occurs when jail officials "are deliberately indifferent to a pretrial detainee's serious medical needs." *Id.* To state a plausible deliberate-indifference claim, a plaintiff must allege facts demonstrating (1) that his "medical need was objectively sufficiently serious," *Mata v. Saiz*, 427 F.3d 745, 752 (10th Cir. 2005), and (2) that "the defendant knew of an excessive risk to the plaintiff's health or safety and disregarded that risk, *Rife*, 854 F.3d at 647. Because Wirtz seeks to hold Regalado liable as a defendant-supervisor, he must also allege facts demonstrating that Regalado "(1) . . . promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation." *Brown*, 662 F.3d at 1164 (quoting *Dodds*, 614 F.3d at 1199). Under Tenth Circuit precedent, "[t]he traditional standard for supervisory liability . . . 'requires

allegations of personal direction or of actual knowledge and acquiescence' in a subordinate's unconstitutional conduct." *Arocho v. Nafziger*, 367 F. App'x 942, 956 (10th Cir. 2010) (unpublished) (quoting *Woodward v. City of Worland*, 977 F.2d 1392, 1400 (10th Cir. 1992)).

Taken as true, Wirtz's allegations plausibly show that he had a sufficiently serious medical need while he was incarcerated at the DLMCJC. He alleges he was diagnosed with spinal stenosis and prescribed "Fyntenol 100 microgram patches for pain" before his admission to the DLMCJC. Dkt. 1, at 7. He further alleges that as of late November 2016, the DLMCJC's medical department noted in his file that he had a "bottom bunk restriction," presumably to accommodate his medical condition. *Id.* at 7. At the motion-to-dismiss stage, these allegations plausibly support the objective component of his deliberate-indifference claim. *See Al-Turki v. Robinson*, 762 F.3d 1188, 1192-93 (10th Cir. 2014) ("A medical need is considered sufficiently serious . . . if the condition 'has been diagnosed by a physician as mandating treatment or is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" (quoting *Oxendine v. Kaplan*, 241 F.3d 1272, 1276 (10th Cir. 2001))).

Further, Wirtz's allegations, accepted as true, raise a reasonable inference that Officer # 1 knew about Wirtz's bottom-bunk restriction and recklessly disregarded his need for a bottom bunk when he ordered the top-bunk placement. Dkt. 1, at 14. But the Court agrees with Sheriff Regalado that Wirtz's allegations fail to plausibly show that Regalado acted with the same state of mind. Wirtz alleges (1) he told Regalado about his medical condition and his bottom-bunk restriction in November 2016, and (2) that "all staff" ignored his protests and requests for a bottom bunk in the days immediately following the December 22, 2016, top-bunk placement. Dkt. 1, at 7, 14. He further alleges he wrote letters to Regalado on December 6, 2016, before the top-bunk placement, and twice in February 2017, after he fell from the top bunk, complaining about his need

for pain medications. *Id.* at 7. Even taken as true, neither these allegations nor the reasonable inferences that can be drawn therefrom plausibly suggest that Regalado either directed Officer # 1 to place Wirtz on a top bunk, had knowledge of Officer # 1's decision to place Wirtz on a top bunk, or acquiesced in that decision. *Arocho*, 367 F. App'x at 956.

As a result, Wirtz fails to state a plausible deliberate-indifference claim against Regalado, in his individual capacity, with respect to the top-bunk placement.

### ii. *Municipal liability*

Wirtz's allegations are, however, sufficient to state a plausible deliberate-indifference claim against Regalado in his official capacity. By suing Regalado in his official capacity, Wirtz is attempting to impose liability against Tulsa County. *Porro*, 624 F.3d at 1328. To hold Tulsa County liable, Wirtz must allege facts demonstrating that "the unconstitutional actions of an employee [1] were representative of an official policy or custom of the [county], or [2] were carried out by an official with final policy making authority with respect to the challenged action." *Seamons v. Snow*, 206 F.3d 1021, 1029 (10th Cir. 2000).

As the Tulsa County Sheriff, Regalado is the DLMCJC's final policymaker. *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 402 (1997). But, as discussed, the facts alleged do not plausibly suggest Regalado "carried out" the top-bunk placement that resulted in Wirtz's alleged injuries. Thus, to state a plausible claim, Wirtz must allege facts demonstrating that Officer # 1's placement decision represented an official policy or custom of Tulsa County and that the policy or custom has a direct causal link to the injury alleged. *City of Canton v. Harris*, 489 U.S. 378, 385 (1989). Accepting Wirtz's allegations as true, Sheriff Regalado enforces a custom of "indifference to inmates' medical needs" and has long been aware of "systemic deficiencies" in the policies, procedures, and customs related to providing medical care to inmates. Dkt. 1, at 5-7.

More specifically, he alleges Regalado's "lack of proper oversight and outright indifference" toward inmates' medical needs resulted in the faulty top-bunk placement. *Id.* at 6. At first blush, this allegation appears inconsistent with Wirtz's allegation that the DLMCJC has an existing policy requiring the medical department to record inmates' medical restrictions in the DLMCJC's computer system. *Id.* at 14. However, from the facts alleged it is at least reasonable to infer that Officer # 1 ordered the top-bunk placement, despite Wirtz's documented medical restriction, precisely because Regalado maintains a custom—*i.e.*, a "continuing, persistent and widespread practice"—that permits classification officers to disregard the serious medical needs of DLMCJC inmates. *Gates*, 996 F.2d at 1041. Wirtz's allegations as to the existence of the alleged custom may ultimately prove to be untrue, but the Court finds them sufficient to avoid dismissal of the deliberate-indifference claim he asserts against Sheriff Regalado, in his official capacity, as to the top-bunk placement.

### b.  Deliberate indifference: Denial of effective pain management

As to the denial of effective pain management, Wirtz alleges Dr. Cooper "refused" to provide him with pain medications from December 29, 2016, until March 6, 2017, despite Wirtz's repeated complaints to Cooper that he was experiencing severe pain. Dkt. 1, at 10. When, as here, a plaintiff alleges that a delay in treatment caused his constitutional injury, the plaintiff must "show that the delay resulted in substantial harm." *Al-Turki*, 762 F.3d at 1193 (quoting *Oxendine*, 241 F.3d at 1276). A plaintiff can make this showing by alleging the delay resulted in "lifelong handicap, permanent loss, or considerable pain." *Id.* (quoting *Garrett v. Stratman*, 254 F.3d 946, 950 (10th Cir. 2001)). Wirtz makes that showing here. Specifically, he alleges, as a result of the two-month delay, he experienced "extreme pain and suffering," including the loss of feeling in his legs and groin, "to the point of paralysis," and the loss of bladder control. Dkt. 1, at 7-8, 10.

Wirtz claims Sheriff Regalado is responsible for this constitutional injury, but it is not entirely clear from the complaint whether he contends Regalado is personally liable, as a defendant-supervisor, or whether he asserts this particular claim against Regalado only in his official capacity. Dkt. 1, at 5, 7-8. Accordingly, the Court will consider both theories of liability.

### i. Supervisory liability

To the extent Wirtz sues Sheriff Regalado in his individual capacity, the Court agrees that Wirtz fails to state a plausible Fourteenth Amendment claim as to the two-month delay in providing pain medications. As just discussed, Wirtz sufficiently pleads that his spinal stenosis was a sufficiently serious medical condition. *See supra* section III.A.4.a.*i*. Thus, to hold Regalado personally liable, in his supervisory capacity, Wirtz must allege facts demonstrating that Regalado "(1) . . . promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation." *Brown*, 662 F.3d at 1164 (quoting *Dodds*, 614 F.3d at 1199).

The parties primarily debate whether Wirtz has sufficiently pleaded facts alleging Regalado was responsible for a policy that caused Dr. Cooper to deny, or delay, treatment for Wirtz's pain. Dkt. 23, at 12-14; Dkt. 44, at 2-10. But the plausibility of Wirtz's claim falters on the third element—the requisite state of mind. To state a plausible claim, Wirtz must allege facts demonstrating Regalado "knew of an excessive risk to [his] health or safety and disregarded that risk." *Rife*, 854 F.3d at 647. Wirtz alleges Dr. Cooper was the person responsible for his medical care and the person who declined to provide him prescribed pain medications for two months. Dkt. 1, at 10. He alleges Regalado knew or should of known about the two-month delay because Wirtz wrote numerous letters and grievances to Regalado complaining about Dr. Cooper's actions.

*Id.* at 7-8. But, as Regalado argues, "not being a medical professional, [he] was entitled to reasonably rely on the decisions of Dr. Cooper with regards to the course of treatment" Cooper provided to manage Wirtz's pain. Dkt. 23, at 14; *see Arocho*, 367 F. App'x at 956 (concluding plaintiff's allegations showed only prison warden's "reasonable reliance on the judgment of prison medical staff, which *negates* rather than supports liability" (emphasis in original)). As in *Arocho*, Wirtz's allegations fall short of plausibly suggesting that Regalado disregarded an excessive risk to Wirtz's health by relying on Dr. Cooper's professional judgment as to how best to treat Wirtz's pain. 367 F. App'x at 956. Consequently, Wirtz fails to state a plausible claim for deliberate-indifference against Regalado, in his individual capacity, as to the denial of effective pain management.

### ii.  *Municipal liability*

To the extent Wirtz asserts liability as to this claim under *Monell*, however, the Court finds that he states a plausible Fourteenth Amendment claim. As previously discussed, a plaintiff can state a plausible *Monell* claim by alleging either "that the unconstitutional actions of an employee [1] were representative of an official policy or custom of the [county], or [2] were carried out by an official with final policy making authority with respect to the challenged action." *Seamons*, 206 F.3d at 1029.

Again, there is no dispute that Sheriff Regalado is the final policymaker for the jail or that he is responsible for creating and enforcing the DLMCJC's policies and procedures and for providing adequate medical care to inmates. *Bd. of Cty. Comm'rs of Bryan Cty.*, 520 U.S. at 402; *Estate of Crowell ex rel. Boen*, 237 P.3d at 142. And, as previously discussed, Wirtz's allegations, accepted as true, at least raise a reasonable inference that Regalado maintains a custom of "indifference to inmates' medical needs," as shown by numerous audits of the DLMCJC and

several cases brought against the former Tulsa County Sheriff involving "systemic deficiencies" in the medical department and constitutional violations specifically related to the provision of medical care at the DLMCJC.[12] Dkt. 1, at 5-8. These allegations at least raise a reasonable inference that Dr. Cooper's delay in effectively treating Wirtz's pain conformed with the longstanding custom of deliberate indifference that Regalado maintains at the DLMCJC. *Seifert*, 779 F.3d at 1159. Thus, Wirtz's allegations, accepted as true, are sufficient to state a plausible deliberate-indifference claim against Sheriff Regalado, in his official capacity, as to the denial of effective pain management.

### c. Retaliation claim

In Count II, Wirtz alleges Dr. Cooper violated his constitutional rights by placing him in solitary confinement on March 6, 2017, as a retaliatory, "direct response" to Wirtz's filing of numerous grievances complaining about Cooper's failure to provide adequate medical care. Dkt. 1, at 11. He further alleges that Cooper "escalated the retaliation" by placing him in a dry/camera cell from April 1 until April 13, 2017, because Wirtz continued to file grievances from his solitary cell. *Id.*

Wirtz claims Sheriff Regalado is responsible for Dr. Cooper's retaliation because, "as the head of the jail," Regalado knew or should have known that Cooper placed Wirtz in a solitary cell and later moved him to a dry/camera cell in retaliation for filing grievances. Dkt. 1, at 8. He further alleges, Regalado "had personal knowledge" of the punitive cell placements through his receipt of Wirtz's "almost daily letters and grievances from solitary confinement pleading for the

---

[12] Again, based on Wirtz's allegations, the Court may reasonably infer that Turn Key continued the policies and customs of prior medical providers and that Regalado therefore had knowledge of the deficiencies in care provided by Turn Key. *Cf.* [Doc. 40], *Lee v. Turn Key Health Clinics, LLC,* No. 19-CV-00318-GKF-JFJ (Feb. 27, 2020).

retaliation to stop." *Id.* Wirtz alleges Sheriff Regalado's failure to intervene on his behalf was "part and parcel of Regalado's system of deliberate indifference,"—a system that "allowed [Regalado's] subordinates to retaliate against" Wirtz. *Id.*

It is well settled that "'[p]rison officials may not retaliate against or harass an inmate because of the inmate's exercise of his' constitutional rights." *Peterson v. Shanks*, 149 F.3d 1140, 1144 (10th Cir. 1998) (alteration in original) (quoting *Smith v. Maschner*, 899 F.2d 940, 947 (10th Cir. 1990)). In particular, officials may violate the First Amendment by retaliating against a prisoner for filing administrative grievances. *Gee*, 627 F.3d at 1189. To state a plausible First Amendment retaliation claim, a plaintiff must allege facts showing "(1) that [he] was engaged in constitutionally protected activity; (2) that the defendant's actions caused [him] to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the defendant's adverse action was substantially motivated as a response to [his] exercise of constitutionally protected conduct." *Shero v. City of Grove*, 510 F.3d 1196, 1203 (10th Cir. 2007). Notably, the third element requires a plaintiff to allege facts demonstrating "that 'but for' the retaliatory motive, the incidents to which he refers . . . would not have taken place." *Peterson*, 149 F.3d at 1144 (quoting *Smith*, 899 F.2d at 949-50).

The Court agrees with Sheriff Regalado that Wirtz fails to state a plausible claim against him for retaliation, either in his individual or official capacity. First, as Regalado contends, Wirtz's allegations do not plausibly suggest that Regalado created or maintained a policy or custom of permitting his subordinates to retaliate against prisoners for filing grievances. Dkt. 23, at 15. Wirtz's allegation that Dr. Cooper's punitive cell assignments and Regalado's failure to intervene on Wirtz's behalf "were part and parcel of Regalado's system of deliberate indifference" is conclusory and need not be accepted as true. *Iqbal*, 556 U.S. at 678. Moreover, Wirtz's general

allegations regarding a "system of deliberate indifference" primarily relate to alleged deficiencies in the treatment of prisoner's medical needs. Even liberally construed, these allegations do not plausibly suggest that the same custom that permits DLMCJC or Turn Key staff to ignore the medical needs of prisoners caused Dr. Cooper to retaliate against him for filing grievances by placing him a solitary and dry/camera cell. Because Wirtz fails to allege the existence of a policy or custom that caused the constitutional violation alleged—i.e., the violation of his First Amendment right to redress his grievances—he fails to state a plausible retaliation claim against Regalado, in his official-capacity. *Sanders*, 138 F. Supp. 3d at 1254. Second, even disregarding the conclusory nature of Wirtz's reference to a "system of deliberate indifference," simply asserting that Regalado acted with deliberate indifference by failing to stop the retaliation would not support a plausible retaliation claim against Regalado as a defendant-supervisor. As explained in *Dodds*, a plaintiff must allege facts demonstrating that a defendant-supervisor "acted with the state of mind required to establish the alleged constitutional deprivation." 614 F.3d at 1199. The required state of mind for a First Amendment retaliation claim is a retaliatory motive. *See Shero*, 510 F.3d at 1203 (requiring plaintiff to show defendant's adverse action against plaintiff was "substantially motivated as a response to" plaintiff's exercise of a constitutionally-protected right). As Regalado argues, Wirtz alleges that Dr. Cooper ordered Wirtz's placements in solitary cell in the medical unit and, later, in the dry/camera cell. Dkt. 1, at 11-12; Dkt. 23, at 15-16. And it is not reasonable to infer from the facts alleged that Regalado either directed Dr. Cooper to order these placements or that Regalado's failure to intervene after he had knowledge of these placements was "substantially motivated as a response to" Wirtz's filing of grievances. *Shero*, 510 F.3d at 1203.

For these reasons, Wirtz fails to plausibly allege that Regalado, in either his individual or

official capacity, could be liable for violating Wirtz's constitutional rights by retaliating against him for filing grievances. Thus, the Court grants Regalado's dismissal motion as to the retaliation claim alleged against him in Count II.

### d. HIPAA and constitutional privacy claims

Finally, in Count IV, Wirtz alleges Sheriff Regalado violated the HIPAA and his constitutional rights to privacy by "maintaining a policy and procedure whereby [Wirtz's] private medical records are disseminated to nonmedical Sheriff personnel." Dkt. 1, at 9. In support, Wirtz alleges that the DLMCJC's medical records custodian, Kathy Pingleton, told Wirtz on "numerous" occasions that the DLMCJC's "policy and procedure" allows inmates medical grievances to be maintained by "nonmedical staff." *Id.* He further alleges that this policy resulted in the "wrongful dissemination of [his] private medical information" and "a clear violation" of his constitutional rights to due process and privacy. Dkt. 1, at 9.

As Wirtz concedes, he has no private cause of action under the HIPAA. Dkt. 44, at 12. And the Court agrees with Regalado that Wirtz's allegations relevant to Count IV fail to state any plausible constitutional violations. Dkt. 23, at 15-18. Even accepting as true that Sheriff Regalado enforces a policy that permits nonmedical jail personnel to maintain medical grievances filed by DLMCJC inmates, Wirtz's allegations do not plausibly suggest that this policy has no legitimate penological purpose. *Turner*, 482 U.S. at 89. Moreover, as previously discussed, Wirtz fails to identify any specific private medical information that Regalado disclosed pursuant to the cited policy. Dkt. 1, at 9. Without more, Wirtz's allegations do not plausibly support that Regalado wrongfully disclosed his private medical information or that he did so in a manner that unconstitutionally infringed on Wirtz's constitutional rights to privacy. *Leiser*, 2017 WL 4099469, at * 4. The Court therefore grants Regalado's dismissal motion as to the HIPPA claim and

constitutional privacy claims asserted against him in Count IV.[13]

### B. ADA Claim

In Count III, Wirtz claims all four movants violated his rights under Title II of the ADA, by denying him "access to Church and religious programs, law library, sunlight, recreation, television and all other programs, activities and services allowed other inmates" while he was held in solitary confinement. Dkt. 1, at 3, 8, 10-11, 13-14.

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by such entity." 42 U.S.C. § 12132. Title II's protections extend to inmates and detainees held in county jails. *Robertson v. Las Animas Cty. Sheriff's Dep't*, 500 F.3d 1185, 1193 (10th Cir. 2007); *see also* 42 U.S.C. § 12131(1) (defining "public entity" to include, *inter alia*, "any State or local government" and "any department, agency, special purpose district or other instrumentality of a State or States or local government"). To state a plausible Title II claim, a plaintiff must allege facts demonstrating "that (1) he is a qualified individual with a disability, (2) who was excluded from participation in or denied the benefits of a public entity's services, programs, or activities, and (3) such exclusion, denial of benefits, or discrimination was by reason of a disability." *Robertson*, 500 F.3d at 1193.

Under Title II, "[t]he term 'qualified individual with a disability" means an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the

---

[13] Because the Court concludes the complaint fails to state any plausible § 1983 claims against Sheriff Regalado, in his individual-capacity, the Court finds it unnecessary to consider his assertion of qualified immunity.

removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity."  42 U.S.C. § 12131(2).  Title II does not further define the term "disability."  *Id.*  However, in 2008, Congress substantially broadened the ADA's general definition of the term "disability" to cover individuals who either have, or are merely regarded as having, "a physical or mental impairment that substantially limits one or more major life activities."  42 U.S.C. § 12102(1)(A); *see, e.g.*, *Adair v. City of Muskogee*, 823 F.3d 1297, 1304-06 (10th Cir. 2016) (discussing impact of the changes Congress made to the ADA by enacting the ADA Amendments Act of 2008 (ADAAA), Pub. L. No. 110-325, 122 Stat. 3553 (codified at 42 U.S.C. § 12101 *et seq.*)).

In support of his ADA claim, Wirtz alleges Dr. Cooper placed him in solitary confinement on March 6, 2017, "in direct response" to Wirtz's continuous filing of grievances and written complaints to the Medical Board, Sheriff Regalado and Turn Key about Cooper's failure to treat his pain.  Dkt. 1, at 10-11.  That same day, Cooper began administering morphine to treat Wirtz's pain.  *Id.*  Wirtz remained in solitary confinement in the medical unit from March 6, 2017, until May 11, 2017.  *Id.* at 8, 11.  During that period, Wirtz alleges he "was denied access to Church and religious programs, law library, sunlight, recreation, television, and all other programs, activities and services allowed other inmates."  *Id.* at 8, 11.

Movants assert various arguments to support their requests for dismissal of the ADA claim. Sheriff Regalado, Dr. Cooper and Turn Key contend that, even assuming Wirtz sufficiently pleads that he is a qualified individual with a disability, he fails to plausibly allege he was discriminated against on the basis of his disability.  Dkt. 23, at 19-20; Dkt. 50, at 4-5; Dkt. 51, at 4-5; Dkt. 52, at 3-4.  Taking a different tack, the BOCC contends that because it "lacks any authority or ability to

control the daily operations of the jail, it necessarily could not have discriminated against [Wirtz] by reason of his alleged disability while [he] was housed at the jail." Dkt. 48, at 4.

### 1.    Dr. Cooper and Turn Key

Accepting Wirtz's allegations as true, the Court finds them sufficient to plausibly support that he is a qualified individual with a disability.  Nonetheless, for two reasons, he fails to state a plausible ADA claim against either Dr. Cooper or Turn Key.  First, Dr. Cooper cannot be held liable, as an individual, for the alleged ADA violations.  *Cf. Butler v. City of Prairie Vill.*, 172 F.3d 736, 744 (10th Cir. 1999) (holding, in context of alleged violation of Title I of the ADA, which prohibits discrimination by employers "that the ADA precludes personal capacity suits against individuals who do not otherwise qualify as employers under the statutory definition"); *see Brooks v. Colo. Dep't of Corr.*, 715 F. App'x 814, 817-18 (10th Cir. 2017) (unpublished) (affirming district court's dismissal of individual-capacity claims prisoner plaintiff asserted against three correctional officials for alleged violations of Title II of the ADA and relying on *Butler* to state those "claims were properly dismissed because Title II does not create individual liability").

Second, as a private corporation that contracts with the Tulsa County Sheriff's Office to provide health care to DLMCJC prisoners, Turn Key cannot be held liable because it is not a "public entity" under Title II of the ADA.  *See Phillips v. Tiona*, 508 F. App'x 737, 754 (10th Cir. 2013) (unpublished) (holding that "Title II of the ADA does not generally apply to private corporations that operate prisons" because the private corporation is not "an instrumentality of government in the same sense as a 'department, agency, or special purpose district'"); *Edison v. Douberly*, 604 F.3d 1307, 1308-10 (11th Cir. 2010) (collecting cases and concluding that "a private corporation is not a public entity [under Title II of the ADA] merely because it contracts with a public entity to provide some service").

For these reasons, and even accepting as true (1) that Wirtz is a qualified individual with a disability and (2) that Dr. Cooper discriminated against him "by reason of [his] disability," *Robertson*, 500 F.3d at 1193, he fails to state a plausible ADA claim against either Dr. Cooper or Turn Key.

### 2. Sheriff Regalado and the BOCC

To the extent Wirtz purports to assert his ADA claim against Sheriff Regalado, in his individual capacity, that claim also must be dismissed for failure to state a claim. *See Brooks*, 715 F. App'x at 818. However, to the extent he asserts his ADA claim against Tulsa County, by suing the BOCC, or against the Tulsa County Sheriff's Office (TCSO), by suing Sheriff Regalado in his official capacity, both the County and the TCSO are public entities subject to potential liability under Title II. *See* 42 U.S.C. § 12131(1) (defining "public entity" to include, *inter alia*, "any State or local government" and "any department, agency, special purpose district or other instrumentality of a State or States or local government"). And, contrary to the BOCC's apparent argument, a public entity can be "vicariously liable for the acts of its employees who violate Title II of the ADA." *Doe v. Bd. of Cty. Comm'rs of Craig Cty.*, No. 11-CV-0298-CVE-PJC, 2011 WL 6740285, at *2 (N.D. Okla. Dec. 22, 2011) (unpublished).

Sheriff Regalado contends Wirtz's allegations do not plausibly show an ADA violation because, even if true, the facts alleged suggest only that Dr. Cooper denied him access to the DLMCJC's services, programs and activities as retaliation for filing grievances, not based on his alleged disability. Dkt. 23, at 19-20; Dkt. 50, at 4-5. The question before the Court is not whether Wirtz will prevail on his claim, but whether he states a plausible claim. To state a plausible ADA claim, Wirtz must allege (1) he is a qualified individual with a disability and (2) he was excluded from services, programs and activities because of his disability. *Robertson*, 500 F.3d at 1193.

Accepting his allegations as true, Dr. Cooper denied him access to services, programs and activities provided to other inmates (1) while he was held in solitary confinement (2) in the medical unit (3) after Dr. Cooper "finally relented" and began administering morphine to treat his pain caused by spinal stenosis and a fall from the top bunk of his jail cell and (4) while he continued to file grievances complaining about Dr. Cooper's failure to adequately treat the pain caused by his spinal stenosis. Dkt. 1, at 7 n.2, 8, 11. As Wirtz argues, regardless of whether Dr. Cooper's initial decision to place him in solitary confinement was substantially motivated by retaliation, the facts alleged, considered as a whole and accepted as true, at least raise a reasonable inference that Cooper denied him access to the DLMCJC's services, programs and activities based on his disability. Dkt. 42, at 2-3; Dkt. 44, at 10-11; Dkt. 46, at 7-8. Thus, the Court finds his allegations sufficient to state plausible claims against the BOCC and Sheriff Regalado for the alleged ADA violations.

### C.    State law claims

Relying on the same facts he alleges to support his federal claims, Wirtz asserts various claims against movants under Oklahoma law. Dkt. 1, at 5-14. He specifically asserts (1) claims against all movants and Officer # 1 for violating his rights to due process and adequate medical care, under Article II, §§ 7 and 9 of the Oklahoma Constitution, by (a) being deliberately indifferent to his serious medical needs (Count I), (b) retaliating against him for filing grievances (Count II), and (c) disclosing his private medical information to nonmedical jail personnel (Count IV); and (2) common-law tort claims against Regalado, Dr. Cooper and Turn Key, for medical negligence, negligence per se and invasion of privacy based on (a) Dr. Cooper's refusal to provide a written treatment plan, (b) Regalado's and Cooper's breach of doctor-patient privilege through the disclosure of his private medical records, and (c) Dr. Cooper's failure to provide adequate

medical care.  Dkt. 1, at 2-3, 6-14.

Movants seek dismissal of these state law claims under the Oklahoma Governmental Tort Claims Act (GTCA), OKLA. STAT. tit. 51, §§ 151 *et seq.*  The GTCA "is the exclusive remedy for an injured plaintiff to recover against a governmental entity in tort."  *Tuffy's, Inc. v. City of Oklahoma City*, 212 P.3d 1158, 1163 (Okla. 2003).  The GTCA generally immunizes, "the state, its political subdivisions, and all of their employees acting within the scope of their employment" from liability for torts.  OKLA. STAT. tit. 51, § 152.1(A).  As defined in the GTCA, a "tort" is "a legal wrong, independent of contract, involving violation of a duty imposed by general law, statute, the Constitution of the State of Oklahoma, or otherwise, resulting in a loss to any person . . . as the proximate result of an act or omission of a political subdivision or the state or an employee acting within the scope of employment."  OKLA. STAT. tit. 51, § 152 (14); *see also Barrios v. Haskell Cty. Public Facilities Auth.*, 432 P.3d 233, 238 (Okla. 2018) (explaining that the Oklahoma Legislature amended the GTCA in 2014 "to specify that the State's immunity from suit extended even to torts arising from alleged deprivations of constitutional rights").

The immunity provided by the GTCA is subject to a limited waiver for the state and its political subdivisions, but "only to the extent and in the manner provided" in the GTCA.  OKLA. STAT. tit. 51, § 152.1(B).  Significantly, compliance with the GTCA's notice-of-claim and denial-of-claim provisions, OKLA. STAT. tit. 51, §§ 156, 157, is a jurisdictional prerequisite for the GTCA's waiver of sovereign immunity to become effective.  *Shanbour v. Hollingsworth*, 918 P.2d 73, 75 (Okla. 1996); *Griffey v. Kibois Area Transit System*, 328 P.3d 687, 690 (Okla. Civ. App. 2013).  And the "[f]ailure to present written notice as required by the GTCA results in a permanent bar of any action derivative of the tort claim."  *Harmon v. Cradduck*, 286 P.3d 643, 652 (Okla. 2012) (citing OKLA. STAT. tit. 51, § 156(B)).

### 1.    The BOCC and Sheriff Regalado

The BOCC and Sheriff Regalado urge dismissal of the state law claims for three reasons. First, they argue the Court lacks subject-matter jurisdiction over Wirtz's state law claims because he failed to comply with the GTCA's notice-of-claim and denial-of-claim provisions. Dkt. 21, at 9-10; Dkt. 23, at 20-22; Dkt. 48, at 2-3. Second, they argue that even if the Court has jurisdiction, they have statutory immunity under OKLA. STAT. tit. 51, § 155(25), which immunizes the State and its political subdivisions from liability for torts arising from the "provision, equipping, operation or maintenance of any prison, jail or correctional facility." Dkt. 21, at 11-14; Dkt. 23, at 22-25; Dkt. 48, at 2-3. Third, they argue that they are improperly named as defendants under OKLA. STAT. tit. 51, § 153(C), to the extent Wirtz asserts individual-capacity claims against Sheriff Regalado or individual members of the BOCC. Dkt. 21, at 14-15; Dkt. 23, at 26-27.

Wirtz does not seriously dispute any of these arguments. Dkt. 44, at 13; Dkt. 45, at 2. And the Court agrees with the BOCC and Regalado that the complaint does not sufficiently plead compliance with the GTCA's notice-of-claim and denial-of-claim provisions. Dkt. 1, generally. To be fair, Wirtz does allege that he "notified [the BOCC] of his tort claim for the fall" on February 1, 2017, but he received no response. *Id.* at 9. Even liberally construed, the Court does not find this allegation sufficient to allege compliance with the GTCA's notice-of-claim and denial-of-claim provisions. Thus, to the extent Wirtz seeks to impose tort liability against Tulsa County by asserting state law claims against the BOCC and Sheriff Regalado, the Court finds those claims must be dismissed, without prejudice, for lack of jurisdiction.

Moreover, even assuming the complaint could be read to allege sufficient compliance with the GTCA's jurisdictional provisions, each of his alleged injuries occurred at the DLMCJC, and the BOCC and Sheriff Regalado are immune from liability for torts arising from the "provision,

equipping, operation or maintenance of any prison, jail or correctional facility," OKLA. STAT. tit. 51, § 155(25), including claims arising under the Oklahoma Constitution, *see Barrios*, 432 P.3d 239. As a result, even if subject-matter jurisdiction exists, the GTCA's immunity provisions bar his claims against the BOCC and Regalado.

### 2.    Dr. Cooper and Turn Key

Dr. Cooper and Turn Key do not appear to challenge Wirtz's failure to sufficiently plead compliance with the GTCA's notice-of-claim and denial-of-claim provisions. Dkt. 29, at 18-20; Dkt. 30, at 13-15; Dkt. 51, at 5-11; Dkt. 52, at 4-10.[14] Rather, they contend, in light of *Barrios*, that the GTCA bars the state law claims Wirtz asserts against them because those claims arise from the "provision, equipping, operation or maintenance of any prison, jail or correctional facility," OKLA. STAT. tit. 51, § 155(25), including his claims alleging violations of the Oklahoma Constitution, *see Barrios*, 423 P.3d 239. Dkt. 29, at 18-20; Dkt. 30, at 13-15; Dkt. 51, at 5-11; Dkt. 52, at 4-10. In addition, Turn Key and Cooper argue they are both "employees" entitled to immunity under OKLA. STAT. tit. 51, § 152(7)(b) and 153(A). Dkt. 29, at 18-20; Dkt. 30, at 13-15; Dkt. 51, at 5-11; Dkt. 52, at 4-10. Under OKLA. STAT. tit. 51, § 152(b)(7), the GTCA defines "employees" of the state to include "licensed medical professionals under contract with city, county, or state entities who provide medical care to inmates or detainees in the custody or control of law enforcement agencies." Turn Key and Dr. Cooper argue that "[t]he Oklahoma Supreme Court in *Barrios* strongly indicated that Turn Key and its staff constitute employees under Section

---

[14] In their reply briefs, Dr. Cooper and Turn Key also contend that the statutes and code provisions Wirtz cites either do not give rise to tort liability or do not provide for private cause of action. Dkt. 51, at 5-10; Dkt. 52, at 4-9. As previously noted, the Court finds it reasonable to read Wirtz's references to these sources of law as an attempt to assert common law tort claims for negligence per se and invasion of privacy, rather than an attempt to assert separate claims for the alleged violations of each statute or code provision. *See supra* n.5.

152(7)(b), and several cases in this Court since *Barrios* have applied the [GTCA's] immunity to Turn Key or its predecessor medical providers." Dkt. 51, at 11; *see also* Dkt. 30, at 14-15.

In *Barrios*, the Oklahoma Supreme Court assumed for purposes of answering certified questions that Turn Key Health, LLC and its staff were "employees" under section 152(7)(b). *Barrios*, 423 P.3d at 236 n.5. In doing so, the Oklahoma Supreme Court noted that "[g]enerally speaking, the staff of a healthcare contractor at a jail are 'employees' who are entitled to tort immunity under the GTCA by virtue of sections 152(7)(b), 153(A), and 155(25)." *Id.* This court and other courts in this district have found that reasoning to be persuasive. *See Prince v. Turn Key Health Clinics, LLC*, No. 18-CV-0282-CVE-JFJ, 2019 WL 238153, at *9 (N.D. Okla. Jan. 16, 2019); *Birdwell v. Glanz*, No. 15-CV-304-TCK-FHM, 2019 WL 1130484, at *10 (N.D. Okla. Mar. 12, 2019)[15]; *Burke ex rel. Godsey v. Regalado*, No. 18-CV-231-GKF-FHM, 2019 WL 1371144, at **2-3 (N.D. Okla. Mar. 26, 2019).

The *Barrios* court's interpretation of "employees" is persuasive, as it gives effect to the apparent purpose of the GTCA as reflected in sections 152(7)(b), 153(A), and 155(25), whereas the interpretation suggested by plaintiff would undermine that purpose. *See Prince*, 2019 WL 238153, at *9 (finding *Barrios* persuasive as to meaning of "employees" under the GTCA). Accordingly, the Court holds that Turn Key and Dr. Cooper are immune from tort liability under the Oklahoma Governmental Tort Claims Act.

Additionally, the Court agrees with Dr. Cooper and Turn Key's alternative argument that Wirtz's allegations, even accepted as true, fail to plausibly suggest that they violated his rights

---

[15] In an unpublished decision, a Tenth Circuit panel reversed and remanded the *Birdwell* decision. *Birdwell v. Glanz*, 790 F. App'x 962 (10th Cir. Jan. 23, 2020). However, the Tenth Circuit panel decided that the court should not have retained supplemental jurisdiction over the one remaining state law claim, and did not determine the substantive issue.

under Article II, §§ 7 and 9, with respect to the alleged dissemination of his private medical information to nonmedical jail personnel. His state constitutional privacy claims fail for the same reasons as his federal constitutional privacy claims. *See supra* sections III.A.2.b, III.A.3.b and III.A.4.d. Likewise, to the extent he relies on the alleged disclosure of his private medical records to nonmedical jail personnel to assert a common-law tort claim for invasion of privacy, he fails to state a plausible claim. *See Eddy*, 715 P.2d at 77-78 (identifying elements required to prove invasion of privacy by publication of private facts as (1) publicity, (2) which is unreasonable and (3) which is given as a private fact). As discussed, even accepting as true that Dr. Cooper shared his medical information with nonmedical jail personnel the facts alleged in the complaint do not plausibly suggest the disclosures were unreasonable, much less unconstitutional. Dkt. 1, at 12-13.

For these reasons, the Court grants the dismissal motions filed by Turn Key and Dr. Cooper as to the state law claims asserted against them.

## D. Conclusion

Based on the foregoing analysis, the Court grants the BOCC's dismissal motion as to (1) all § 1983 claims and state law claims asserted against it in Counts I, II and IV and (2) all common-law tort claims. The Court denies the BOCC's dismissal motion as to the ADA claim asserted against it in Count III.

The Court grants Dr. Cooper's partial motion to dismiss.

The Court grants Turn Key's dismissal motion as to (1) the ADA claim asserted against it in Count III, (2) all federal claims asserted against it in Count IV, (3) all state law claims asserted against it in Counts I, II and IV and (4) all common-law tort claims. The Court denies Turn Key's dismissal motion as to the § 1983 *Monell* claims for deliberate-indifference and retaliation asserted in Counts I and II.

The Court grants Sheriff Regalado's dismissal motion as to (1) the § 1983 deliberate-indifference claims asserted against him, in his individual capacity, in Count I, (2) the § 1983 retaliation claim asserted against him in Count II, in any capacity, (3) the ADA claim asserted against him in Count III, in his individual capacity, (4) all federal claims asserted against him in Count IV, (5) all state law claims asserted in Counts I, II and IV, and (6) all common-law tort claims. The Court denies Sheriff Regalado's dismissal motion as to (1) the § 1983 *Monell* claims for deliberate indifference and retaliation asserted against him in Counts I and II, (2) and the ADA claim asserted against him in Count III, in his official capacity.

**ACCORDINGLY, IT IS HEREBY ORDERED** that:

1. Unknown Classifications Officer # 1 is **dismissed from this action, without prejudice**, based on Wirtz's failure to timely effect service.

2. The BOCC's motion to dismiss (Dkt. 21) is **granted in part and denied in part**.

3. Dr. Cooper's partial motion to dismiss (Dkt. 30) is **granted**.

4. Turn Key's motion to dismiss (Dkt. 29) is **granted in part and denied in part**.

5. Sheriff Regalado's motion to dismiss (Dkt. 23) is **granted in part and denied in part**.

6. The complaint is **dismissed, in part**, as follows:

   - **Count I** is **dismissed without prejudice** as to all § 1983 claims and state law claims asserted against the BOCC, all individual-capacity § 1983 claims asserted against Sheriff Regalado, and all state law claims asserted against Regalado, Dr. Cooper and Turn Key.

   - **Count II** is **dismissed without prejudice** as to all § 1983 claims and state law claims asserted against the BOCC and Sheriff Regalado, and all state law claims asserted against Dr. Cooper and Turn Key.

- **Count III** is **dismissed with prejudice** as to the ADA claims asserted against Dr. Cooper, Turn Key and Sheriff Regalado, in his individual capacity.

- **Count IV** is **dismissed with prejudice** as to the HIPAA claims asserted against all defendants, and **dismissed without prejudice** as to all § 1983 claims and state law claims asserted against all defendants.

- All common-law tort claims asserted against Sheriff Regalado and the BOCC are **dismissed without prejudice** for lack of jurisdiction.

- All common-law tort claims asserted against Turn Key and Dr. Cooper are **dismissed with prejudice** on immunity grounds.

7. Pursuant to this Court's prior order (Dkt. 102), this case shall remain stayed pending this Court's resolution of Wirtz's partial motion for summary judgment.

**DATED** this 2nd day of March 2020.

GREGORY K. FRIZZELL
UNITED STATES DISTRICT JUDGE